33 N.J. Super. 128 (1954)
109 A.2d 457
HUBERT D. GALLAGHER, GUARDIAN FOR JANE DEEGAN AND MARY ELIZABETH DEEGAN, PLAINTIFF-APPELLANT,
v.
NEW ENGLAND MUTUAL LIFE INSURANCE COMPANY OF BOSTON, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 1954.
Decided November 19, 1954.
*129 Before Judges EASTWOOD, GOLDMANN and SCHETTINO.
Mr. Samuel Milberg argued the cause for plaintiff-appellant (Messrs. Milberg & Milberg, attorneys).
Mr. Nicholas Conover English argued the cause for defendant-respondent (Messrs. McCarter, English & Studer, attorneys).
The opinion of the court was delivered by SCHETTINO, J.S.C. (temporarily assigned).
Plaintiff appeals from a judgment of the Law Division, sitting without a jury, granting defendant insurance company on its counterclaim rescission of two insurance policies, each for $25,000, on the life of plaintiff's decedent.
Plaintiff instituted suit to recover the proceeds of the policies and defendant counterclaimed asserting that the insured committed equitable fraud by misrepresenting material facts. The misrepresentations in his application were: (1) decedent had suffered from indigestion a number of times; his answer, he had not; (2) decedent had suffered from palpitation of the heart and shortness of breath; his *130 answer, he had not; (3) the insured indicated that he never had been advised that he had high or low blood pressure, whereas he had so been advised; (4) decedent failed to include reference to several long confinements at hospitals and the number of times he had been treated at hospitals; (5) decedent stated that he had never been on a diet; actually he had been on a diet for several years; (6) decedent stated that he had not consulted or been treated by a physician within the past five years, whereas in fact he had been treated numerous times; (7) decedent indicated that he had never had electrocardiograms or X-rays taken although, in fact, several had been taken. During the course of the trial defendant requested permission to withdraw, as a ground for rescission, the statement respecting the electrocardiogram. No contention is made that the application questions were not material to the risk. Locicero v. John Hancock Life Ins. Co., 32 N.J. Super. 300, 306 (App. Div. 1954).
At the time the policies were issued defendant had before it the insured's application, a medical examiner's report which did not include an electrocardiogram, X-ray or a fluoroscope, the insurance agent's certificate, a retail credit report, and the Medical Information Bureau (hereafter referred to as M.I.B.) report indicating an electrocardiogram had been taken. This M.I.B. report was in code, showing that the insured had a left axis deviation, marked, which is a deviation from a normal heart.
Plaintiff admitted on oral argument that the answers in the application were false but seeks to avoid their effect by claiming defendant had knowledge of the false statements and was therefore under a duty to make further inquiries and that, since it did not do so, rescission should not be allowed. The trial court found that the representations were material, that the defendant relied upon them, and that defendant was not put into a position to make further inquiry by the M.I.B. report, and granted rescission.
The plaintiff first argues that the defendant had knowledge of the falsity of the representations.
*131 It is undisputed that defendant had in its possession at the time it was considering the application for insurance the M.I.B. report indicating an electrocardiogram had been taken and that it disclosed a left axis deviation of the heart. Dr. Hendrix, defendant's witness, testified that persons with such a deviation would have no heart pathology in 25 to 30% of the cases. Dr. Bernstein, plaintiff's witness, testified that, in spite of a negative history given in the application and a negative physical examination, the presence of the deviation at age 47 (insured's age) showed more probably the presence of a heart disease.
Plaintiff argues that since in 70% of the cases such a report would indicate a disease of the heart defendant knew or should have known that decedent had falsely answered the question concerning the electrocardiogram and that therefore defendant was under a duty to make further inquiry. It would seem that plaintiff's entire case depends upon John Hancock Mutual Life Ins. Co. of Boston, Mass. v. Cronin, 139 N.J. Eq. 392 (E. & A. 1947). The court there stated (139 N.J. Eq. at pages 397-398) that the fact an insurer makes an investigation does not absolve the applicant from speaking the truth nor lessen the right of the insurer to rely upon his statements, "unless the investigation discloses facts sufficient to expose the falsity of the representations of the applicant or which are of such a nature as to place upon the insurer the duty of further inquiry." (Italics supplied.)
If plaintiff is to succeed in this action, plaintiff must establish that duty to inquire. The court in the Cronin case was addressing itself to a situation where an independent investigation was made, but should the principle apply where the fact putting defendant on notice is the M.I.B. report involved in this case?
Dr. Frost, who approved the policy from the medical angle, saw the M.I.B. report. This report was forwarded from the insurance companies' clearing house for medical impairments and Dr. Frost knew it was based on an application for life insurance by the insured (or an inquiry by an agent for the insured) with another company. Dr. Frost testified *132 he did not pay any attention to the M.I.B. report because the physical examination of the insured by Dr. Meeker, medical examiner for defendant, gave no evidence of enlargement of the heart. Dr. Frost stated such enlargement could not be discovered unless an electrocardiogram, X-ray, or fluoroscope was taken, and these were not taken by Dr. Meeker nor ordered by Dr. Frost. Dr. Frost also said that a left axis deviation as shown in the M.I.B. report might be caused by an enlargement of the heart or by the position of the heart due to a large diaphragm.
Plaintiff argues that it was more probable than not that the insured had a heart disease, considering his age and the fact that approximately 70% of persons with such deviations have a heart disease and that notwithstanding the insured's statement but in fact because of it, defendant had a duty to make further inquiry; that if an application is received from an individual who denies all signs of a heart condition and a report is discovered which indicates a probability of 70 out of 100 that he has a heart condition, the fact that he denied such a condition should impel an investigation. Plaintiff further contends that where the known facts raise or should raise in the mind of a reasonable person an inference that the offered representations of fact may not be true, a duty devolves upon the party to whom the representations are made to make fair investigation within the range of the justified inference before he can urge he was defrauded thereby.
We feel that the basic problem in this case is what effect must be given to the M.I.B. report. If only the report is considered, the result would be agreement with plaintiff's contentions. However, if the report and all other factors involved in the application are considered as a whole, or if the report relates to the other factors, then a different result might be reached. In reviewing the record we must consider the impact of the report on all the other data in the hands of defendant at the time the decision to issue the policies was made. The M.I.B. report is to be blended with all the other information. We cannot isolate it or its significance *133 and set it off in a vacuum. Justice requires the delicate weighing of all the significant factors and the determination of the impact of each on all the others.
The M.I.B. report was projected by defendant upon a medical history which showed, affirmatively, that decedent was in good health. What was decedent's history as given by him in his certified answers to questions in the application? He denied any illness from childhood except pneumonia in 1918; his weight was stationary; he said he never suffered from any symptoms of heart disease; denied ever having been told that he might have high blood pressure, urine trouble, cancer and tuberculosis; stated that his only surgical operation was an appendectomy in 1911; said that he had been treated at a hospital on another occasion for a broken right radius; and denied having consulted or been examined by a physician or other practitioner within the previous past five years.
We must next consider what additionally was in the decedent's file when defendant finally decided to issue the policies. It had before it a medical examiner's report which appeared to be in order. The report indicated blood pressure within normal limits, pulse normal, and no evidence of present or past disease of the blood vessels or heart. Plaintiff admitted at the trial that this examination was a proper one except as to a chemical analysis which he claims the doctor failed to perform.
Defendant also had before it a Retail Credit Company Service Report which, stated under "Health Family History":
"The applicant is a man of average proportions, normal and healthy in his appearance and we do not learn that he has ever had serious illnesses or operations."
Decedent himself was interviewed by the Retail Credit Company investigator. It is conceded that other parts of the company's report were false in fact but this the defendant did not know. The testimony shows that defendant had no supervision, control or direction over the Credit Company and that this company was a separate and distinct organization *134 not connected with the defendant. Also we must consider what was the M.I.B. report? The report was referred to as "M.I.B. code of 340" which covered only electrocardiograms. Different code numbers refer to other medical subject matters such as blood pressure. The report in the instant case disclosed a left axis deviation, marked, which could be caused either by disease or by the position of the heart due to a high diaphragm without reference to any disease. Thus, the data before defendant contained affirmative statements by decedent of good health; the medical examiner's report consistent with that representation and a credit report also consistent.
Blended with all the other information in defendant's possession what effect should the M.I.B. report have had on its determination to make or not make further inquiry? Was it reasonable for defendant's underwriters to give this report the emphasis which appellant urges?
In John Hancock Mutual Life Ins. Co. of Boston, Mass., v. Cronin, 139 N.J. Eq. 392 (E. & A. 1947), an independent investigation disclosed some discrepancies in the insured's application. The insurance company had data in its hands which, if further inquiry had been made, would have disclosed the true condition of the insured's health and medical history. The court held that the insurance company had relied upon the insured's representations and the policy should be cancelled for fraud.
"We find that misrepresentations were made by the insured; they were material and purposely made and were relied upon by the company. The independent investigation voluntarily undertaken by appellant did not disclose any facts from which the company knew or could by reasonable diligence have known of the true nature of the misrepresentations." (139 N.J. Eq. at page 398)
In Provident Life and Accident Ins. Co. v. Hawley, 123 F.2d 479 (4th Cir. 1941), the record showed that at the time issuance of the policies was approved, the insurance company had before it information indicating that some of the insured's statements in his application were not true. It was held, nevertheless, that there was no duty of further *135 inquiry put upon the insurance company. The court said (123 F.2d at pages 482-483):
"The appellees, however, insist that although the knowledge acquired by the company may not have been full and complete, yet it was sufficient to put the company upon inquiry from which the whole extent of the bad health of the applicant could have been ascertained. Illustrations are found in the decided cases in which the insurer, although not in possession of full information, had knowledge of facts of such a character as to suggest to a prudent person the need for further investigation into the insurability of the applicant. * * * But, on the other hand, it has been frequently held that the mere fact that the insurer has knowledge that some of the statements in an application are incorrect does not of itself put the insurer on inquiry, and charge it with knowledge of all the facts that an inquiry would disclose. * * * In each instance the character of the information possessed by the insurer determines to which class the case belongs. In our opinion, the case at bar belongs in the second class. The information that the insured, apparently in general good health, had suffered to some extent from rheumatism or arthritis, and had consulted physicians in years past, and had recently visited Hot Springs for treatment, returning in an improved condition, would not suggest that he was in such a serious condition as to require further investigation. From these facts the insurer would have no occasion to suspect that physicians had very recently found physical defects in the applicant indicative of an uninsurable condition. The more reasonable inference was that the only previous sicknesses disclosed in the application, namely, the rheumatic attack in 1925 and the tonsillectomy in 1928, had not seriously affected the applicant's health. In short, the facts were not sufficient to put the Insurance Company upon further inquiry."
In North American Life Assur. Co. v. Jones, 287 Mich. 298, 283 N.W. 587 (Sup. Ct. 1939), insured stated that he did not have a regular doctor, that he had not been under observation or treatment in any hospital except for a tonsillectomy, that he had been last medically examined several years before, and that he had never suffered from or consulted a physician about heart disease or its accompanying symptoms, whereas for the past few years insured had been to a number of doctors for a heart condition and had also been hospitalized for it. The beneficiary asserted estoppel on the ground that the company had learned from the Recording and Statistical Bureau of an electrocardiogram taken in 1934. In holding that the information from the M.I.B. *136 report did not constitute an estoppel, the court stated (283 N.W. at page 589):
"Defendant asserts that the electrocardiograph received by plaintiff in Oct. 1934, disclosed the fact that Jones had consulted a doctor and put plaintiff on notice of any heart trouble. However, this electrocardiogram shows curves within normal limits and does not reveal a heart condition, nor does it show that Jones regularly sought medical attention thereafter.
Notwithstanding the record reveals a knowledge of insured's condition in certain respects, still there is nothing in the record indicating any knowledge on the part of the plaintiff, at the time of issuing this policy, that insured had repeatedly consulted physicians, nor that plaintiff had any reason to suspect a heart condition. This record conclusively shows the insured did knowingly falsely answer some of the material questions in the application. It is not essential, however, that we find actual fraud. Misstatements made in good faith which materially affect acceptance of the risk constitute sufficient grounds for cancellation of the policy."
Policies of insurance have always been considered contracts uberrimae fidei, i.e., contracts of the utmost good faith. Atlantic Casualty Ins. Co. v. Interstate Ins. Co., 28 N.J. Super. 81, 85 (App. Div. 1953); Brunjes v. Metropolitan Life Ins. Co., 91 N.J.L. 296, 298 (E. & A. 1917); Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 316, 48 S.Ct. 512, 72 L.Ed. 895 (1928); 29 Am. Jur., Insurance, sec. 540, p. 436. Where such a relationship exists or should exist it cannot be said that one who is the recipient of fraudulent misrepresentations is not justified in relying upon them since he might have ascertained the falseness of the representations had he made an investigation. Restatement, Torts, sec. 540. "The party perpetrating the fraud should not be permitted to say that he should not have been believed or trusted," Peter W. Kero, Inc., v. Terminal Construction Corp., 6 N.J. 361, 370 (1951). Although it is true that in the market place one deals at one's peril, "In the transaction of business, men ordinarily deal with one another in the belief that each is honest." Lloyd v. Hulick, 69 N.J. Eq. 784, 786 (E. & A. 1906).
We agree with defendant's analysis of plaintiff's argument that plaintiff's case basically is that defendant should not *137 have allowed itself to become the victim of decedent's fraudulent answers; that defendant should have been more suspicious of decedent's application and should not have taken decedent's good faith and truthfulness for granted. Were we to sustain such a position we would go counter to the Supreme Court's declaration that
"It is the policy of the law to protect the unwary and foolish as well as the vigilant from the wiles and artifices of evil-doers and negligence in trusting a representation will not * * * excuse a positive willful fraud * * *." Peter W. Kero, Inc. case, supra (6 N.J. at pages 369-370).
We conclude that the answers in decedent's application, the medical examiner's report, proper on its face, and the credit company's report, also proper on its face, led to defendant's reasonably misinterpreting the significance of the M.I.B. report; that its underwriters' interpretation that the electrocardiogram indicated a positional rather than a disease condition of the heart was a reasonable one; that the weight the underwriters gave the M.I.B. report in the medical analysis of decedent's health was a reasonable one; and that an interpretation that the report should have led defendant to the sources of knowledge of decedent's long-standing heart condition and to the extensive treatments by doctors and hospitals would not be a reasonable one and cannot be the basis for denying rescission. Great Northern Life Ins. Co. v. Vince, 118 F.2d 232, 236 (6th Cir. 1941), certiorari denied 314 U.S. 637, 62 S.Ct. 71, 86 L.Ed. 511 (1941).
In view of the holding that defendant had no duty to make further inquiry and since such a determination is dispositive of the appeal, it is unnecessary to discuss the other grounds for appeal.
Judgment is affirmed without costs.